JAMES F. McKAY, III, Chief Judge.
| Jonathan Veal and Tyrone Bienemy appeal their convictions and sentences for manslaughter. Both of the defendants assert that the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that they were the perpetrators of the killing. In addition, Tyrone Bienemy contends that his sentence as a second felony offender is excessive. Because neither of these assignments has merit, the defendants’ convictions and sentences are affirmed.
STATEMENT OF CASE
The grand jury indicted Jonathan Veal, Tyrone Bienemy, and Chelsea Croft on November 19, 2009, charging each of them with the second degree murder of Randell Riley, Jr. (“Randell Riley”) All three defendants subsequently pled not guilty. The court denied the defendants? motions to suppress the identification on March 5, 2010. Ms. Croft requested a sanity hearing, and on March 30, after a hearing, the court found her competent to proceed. The court denied a motion to sever on October 15, 2010. On October 18, 2010, the State amended the indictment to charge Ms. Croft with manslaughter, and she pled guilty as charged in the amended bill. Trial as to Tyrone Bienemy and Jonathan Veal began on March 21, 2011, and on the second day of trial, Tyrone Bienemy took an ^emergency writ to this Court concerning videotapes that were turned over by the State. The trial court denied any stay in the matter. This Court denied Tyrone Bienemy’s writ. State v. Bienemy, unpub. 2011-0378 (La.App. 4 Cir. 3/22/11). On March 24, 2011, at the conclusion of a four-day trial, the jury found both the defendants guilty of manslaughter. On April 4, 2011, the court sentenced Ms. Croft to serve'twenty years at hard labor.[1] On July 22, 2011, the court sentenced Jonathan Veal to serve thirty-five years at hard labor and sentenced Tyrone Bienemy to serve forty years at hard labor. Both the defendants orally moved for an appeal. The State then filed a multiple bill of information that charged Tyrone Bienemy *782 as a second felony offender. The case was continued several times, and on May 3, 2012, the court found Tyrone Bienemy to be a second offender. The court vacated his original sentence and sentenced Tyrone Bienemy to serve eighty years at hard labor.
The appeal record was lodged in this Court on May 14, 2012. Counsel for Tyrone Bienemy filed a brief on his behalf on June 11, 2012, and counsel for Jonathan Veal filed his brief on June 28, 2012. The State filed its response to Tyrone Biene-my’s brief on July 2, 2012, and its response to Jonathan Veal’s brief on December 13, 2012. Although this Court forwarded a copy of the record to both Tyrone Biene-my and Jonathan Veal in order for them to file pro se briefs, neither man filed a brief. FACTS
Randell Riley was shot and killed in the early morning hours of August 4, 2009, at his home at 3205 Kabel Drive in Algiers. Officers responding to the call found Randell Riley lying partially on top of a weight bench on his back patio. | aThe officers saw pieces of broken glass lying around Randell Riley’s body, and a second story window directly above Randell Riley’s body was broken. Inside the bedroom that had the broken window, officers found blood on the carpet, three nine millimeter casings on the floor, and bloodstains on the window sill.[2] The crime scene technician who processed the scene identified various photographs that he took, including some that showed spent casings found in the second floor hallway, blood on the carpet in the entryway of the bedroom with the broken window as well as in the bedroom itself, and blood in the window area. He also identified photos of a safe that was found near the front door, as well as a camouflage-like mask, a camouflage-colored glove, and various blood samples.
The court qualified Officer Troy Dickerson as an expert in the taking, analysis, and identification of fingerprints. He identified his report of his analysis of evidence in this case. He stated that he analyzed a black and gray safe and a piece of wood doorframe, but he was unable to find any fingerprints on either item. He stated that although the piece of door-frame had been marked as having a possible fingerprint in the bloodstain on it, he was unable to find a fingerprint on it. He examined the evidence eight days after it was collected. The State then recalled the crime lab technician, who testified that although the bloodstain on the doorframe was wet when he first arrived on the scene, it was dry by the time he cut the piece of wood with the bloodstain out of the frame and then put a piece of tape over what appeared to be a fingerprint.
|4Pr. Cynthia Gardner, the forensic pathologist who performed Randell Riley’s autopsy later, that day, testified that Randell Riley sustained one gunshot wound to his chest which injured his diaphragm, heart, and lungs, and then exited his chest and lodged in his right arm. She estimated that this wound would have caused his death within minutes. Randell Riley also sustained two other gunshot wounds to his buttocks, and she agreed that the placement of these three wounds was consistent with someone being shot from the front and then turning away from the shooter. *783 Dr. Gardner testified that the lack of stippling showed that the shots were fired from greater than two feet from the victim. She also stated that Randell Riley sustained a number of superficial injuries that were consistent with falling from a window. She testified that toxicology testing on Randell Riley was negative for drugs or alcohol.
Officer Kenneth Leary, qualified as an expert in ballistics and firearms examination, testified that he tested casings found at the scene and determined that they were all fired from the same nine millimeter gun. He also stated that the bullet retrieved during Randell Riley’s autopsy was a nine millimeter bullet, but he could not tell if it was fired from the same gun that fired the casings because he would need the actual gun used in order to make that determination.
Patricia Joseph testified that Randell Riley, her son, lived with her at the time of his murder, as did as her grandson La-vante Riley and her granddaughter Lash-anti Riley, the victim’s nephew and niece. She stated that at the time, Randell Riley, whom she called Dell, was staying in the upstairs bedroom next to hers; Dell’s bedroom was also across the hall from the bathroom, and her 'grandchildren were staying in a bedroom down the hall. She stated that her boyfriend Aaron Clark was also there that night.
1í;Ms. Joseph testified that at approximately 9:00 p.m., Dell received a phone call and then left the house. He returned in about ten minutes with Chelsea Croft, whom Ms. Joseph had met the day before. Ms. Joseph stated that she went into her bedroom, and when she came back out around 10:00, she saw Ms. Croft in the bathroom, wearing a nightshirt and brushing her hair. She also noticed a cellphone sitting by the sink. Ms. Joseph checked on her grandchildren and then went to bed.
Ms. Joseph stated that sometime after midnight, she thought she heard something and went out of her room to check on Lavante. She saw Ms. Croft coming up the stairs, fully dressed, and man was walking up behind her. Ms. Joseph testified that she told them both hello, and Ms. Croft opened the door to Dell’s room a little and slipped inside. The man remained on the dark part of the stairs. She stated that she asked who was there, but the man did not respond. She described the man as a very large black man. She stated that she turned on the bathroom light, and the man came out of the stairwell holding a gun. He told her to get down on the ground, but she stated that at first she thought it was a joke. He repeated his order for her to get down and be quiet, and she complied, begging him not to do anything. She stated that she hollered, and Aaron Clark, who was in her room, opened the door, looked out, and then closed the door. She stated that Aaron Clark then opened the door again and came out into the hallway. Ms. Joseph testified that “Tyrone” held the gun on Aaron Clark while Aaron Clark picked her up from the floor. At that point, her grandson Lavante came out of his room, saying that he wanted to help his Uncle Dell. She stated that she held Lavante back, and the man backed them into the children’s bedroom, where Lashanti was still in bed. The gunman pointed the gun at Lashanti and ordered her not to look at him because she knew who he was.
| fiMs. Joseph testified that she told the gunman that they did not know who he was, and she slammed the door to the children’s bedroom shut. The gunman did not follow them into the room. She and Aaron Clark opened the window and got Lavante out onto the window ledge. She *784 also climbed out on the ledge, and when she heard gunshots, she and Lavante jumped from the ledge. Lavante fell on top of her. She then saw two men running out of the house. She could only see the backs of the men, and she thought one of them might have had plaits in his hair. Ms. Joseph testified that she went back inside the house, upstairs to Dell’s room, and found Ms. Croft inside. She asked Ms. Croft where Dell was, but Ms. Croft told her that she did not know, although she thought he may have gone out the window. Ms. Joseph went over to the window, looked down, and saw Dell lying on the ground. She ran down to him and called 911 from the cellphone that she had in her hand. She testified that she tried to breathe into Dell’s mouth, but he died. The police then arrived.
Ms. Joseph testified that she knew Tyrone Bienemy, whom she described as a family friend. She admitted that she did not tell the police initially that she was familiar with either of the perpetrators, but after speaking with Dell’s friends, she told the police that Tyrone Bienemy was involved. She stated that her friend then gave the police the contact number for Tyrone Bienemy’s mother.
Ms. Joseph identified the photograph of Dell’s safe, which she stated he normally kept in the corner of the living room. After the shooting, she saw the safe sitting next to the front door. She admitted that she did not know what Dell kept inside the safe. She testified that after the shooting, she discovered that the house phone had been pulled from the wall; a breaker for the downstairs lights had been tripped; and some of the fight bulbs had been taken out of their sockets. Ms. |7Joseph admitted that the man that she saw in the hallway had been wearing a camouflage mask, which only showed his eyes and part of his nose.
On cross-examination, Ms. Joseph stated that she did not see Ms. Croft come out of Dell’s room after the shooting, nor did she see the man with the mask go into Dell’s room. She did not see the second man until she saw both men running away from the house after the shooting, and neither man was wearing a mask at that time. She admitted that she had never seen Jonathan Veal before, and she never identified him. She also admitted that in her 911 call, she stated that she did not know the perpetrators because they were wearing masks. She stated that she did not remember if she told the officers who responded to the scene that she saw Tyrone Bienemy in her house, but she stated that she told Detective Catherine Beckett, the lead investigator, that the gunman resembled Tyrone Bienemy’s shape and size. She did not remember if she told the detective that the gunman’s voice was real deep, but a review of her statement showed that she did say that. She did not remember if she told Detective Beckett that the man she saw in the house was Tyrone Bienemy. Ms. Joseph insisted that she recognized Tyrone Bienemy’s eyes. She also insisted that even if she did not tell Detective Beckett that the man she saw in the hallway was Tyrone Biene-my, she was certain he was the man.
On redirect, when shown her statement, Ms. Joseph testified that she was upset when she gave it. She stated that during the statement, she said that the gunman was someone that she knew. When she was asked in the statement if she recognized that person’s voice, she said no because the voice was real deep, but she emphasized at trial that she never said that the voice was deeper than Tyrone Bienemy’s voice. She could not identify the mask seized from the house as the one worn by the gunman in the hallway, stating that the mask on the gunman was *785 Isthicker. She stated that the man in the hallway was close to her, and she maintained that Tyrone Bienemy was the man in the hallway.
During re-cross, Ms. Joseph denied knowing about someone looking for Dell in connection with a check writing scheme. She stated that Dell was not working at the time of his murder. She also stated that she told Detective Beckett, but not during the statement, that one of the perpetrators had twists in his hair, but she could not remember if she told Detective Beckett about any other facial feature that the gunman had.
Janee Brumfield identified herself as Tyrone Bienemy’s girlfriend. She stated that Jonathan Veal is Tyrone Bienemy’s friend. She testified that on the evening of August 3, 2009, Tyrone Bienemy came home with a woman whose name she did not know, but the woman was nicknamed Puerto Rican Passion. She stated that Tyrone Bienemy told her that the woman was a friend. Ms. Brumfield testified that she, Tyrone Bienemy, and the woman went to Jonathan Veal’s house, where they ate, and then she went to sleep because she was not feeling well. She stated that Tyrone Bienemy, Jonathan Veal, and the woman were not there when she next woke up. She dozed, and then later only Jonathan Veal and Tyrone Bienemy returned. She stated that later that night, she heard a conversation between Jonathan Veal and Tyrone Bienemy wherein Jonathan Veal told Tyrone Bienemy that he was stupid and not to worry. She stated that both men showered and changed clothes after arriving home. The next morning, Tyrone Bienemy told her that he had gotten a call from his mother, who told him that the police suspected him of being involved in a murder. Ms. Brumfield testified that Tyrone Bienemy told her that he spoke with Orlando Matthews, a police officer. She stated that Tyrone Bienemy told her that although he told the officer that he was | agoing to meet him in thirty minutes, he did not intend to do so. Ms. Brumfield identified photographs of both Tyrone Bienemy and Jonathan Veal, but she insisted that they did not reflect how the men looked in August 2009.
On cross-examination, Ms. Brumfield testified that she never went to Randell Riley’s house. She testified that she gave a statement to Detective Beckett, but the detective threatened to put her in jail for fifteen years as an accessory for lying. She stated that the detective also threatened to put Ms. Brumfield’s name and photograph on television to embarrass Ms. Brumfield’s mother, who is a police officer. She insisted that the police picked her up from her job and kept her at the police station for a long time. She stated that Tyrone Bienemy told her that he did not want to talk to the police because he was on probation for possession of marijuana. She denied seeing any blood on the defendants’ clothing or in the car, nor did she see a gun in the car.
On redirect, Ms. Brumfield admitted that she gave Detective Beckett two statements, and she lied in the first one because she did not want to be involved in the case. She admitted that she did not mention the other woman in her first statement because of the “nature of the situation,” which she ultimately explained as Ms. Brumfield having a tattoo of Tyrone Bien-emy’s name on her back, and Tyrone Bien-emy’s acceptance of her despite the “issues” that she had. She reiterated that the other woman left that night with the defendants.
On re-cross, Ms. Brumfield testified that the defendants spent a lot of time together, and on the night of the murder, Jonathan Veal’s girlfriend and their infant were also at Jonathan Veal’s house. She stated *786 that she did not mention the other woman during her first statement because the detective did not ask her about the [ inwoman. She insisted that although she saw the woman leave with the defendants, she did not see her actually get in the car with them.
Aaron Clark testified that he was also present on the night of the murder, having come to the house sometime between 10:00 and 11:00 p.m. He and Ms. Joseph went into her room to play cards and listen to music. Sometime later, they heard a noise, and Ms. Joseph left the room to investigate. He heard a shout, opened the door, saw the gunman, closed the door, and then opened it again and saw Ms. Joseph on the floor. His account of the incident basically tracked that of Ms. Joseph. In addition, he stated that he put Ms. Joseph behind him after picking her up from the floor, but she went around him and grabbed the gunman, whom he identified as Tyrone, although he did not know it was Tyrone at the time. He described them being forced into the children’s room, where Ms. Joseph closed the door. He testified that Ms. Joseph and Lavante went out the window, and then he heard shots. He tried to get Lashanti out the window, and as he put his leg through the window, he looked out and saw two men running from the house, one of whom was the man from the hallway. He testified that the man was wearing a mask when he was in the hallway, but he did not think that the mask found at the scene was the one that the man was wearing. He only saw the second man from the back as the men were running away.
Aaron Clark stated that he went back into the bedroom and told .Lashanti to remain there. He went into the hallway and tried to look into Dell’s room, but the light would not work. He then went downstairs and saw Ms. Joseph and La-vante coming up the stairs. He shut and locked the front door, and then he went back upstairs, where he encountered Ms. Croft. He stated that she was fully dressed and told him that she was leaving. He told her to stay because the gunmen might still 11;be in the area. He then went downstairs to make sure that the back door was locked, and he heard Ms. Joseph shout that Dell was in the back yard. As he crossed by the front door, he saw the safe in the hallway along with a bag or purse. He went around them and went to the glass doors at the back of the house, where he saw Dell lying on the side of a weight bench. He went to Dell and yelled to Ms. Joseph to call the police. Ms. Joseph came into the back yard, and he went inside to check on the children. As he passed the front door, he noticed it was open again, and the children told him that Ms. Croft had gone. Aaron Clark testified that he went outside and down the driveway, and he tried to flag down a police car that was passing. A second police car stopped, and he told them that the “girl” had gone.
Aaron Clark testified that he knew that the gunman in the hallway was Tyrone Bienemy. He stated that when Ms. Joseph grabbed the gunman, she said the name Tyrone and asked him why he was “doing this.” He admitted that he did not mention Tyrone Bienemy’s name to the officers when they first arrived, nor did he mention it in his statement to the police. He stated that when he thought about it later, he remembered that Ms. Joseph had said the name Tyrone. He.testified that he had known Tyrone Bienemy for many years, and it was not until he had calmed down that it dawned on him that the gunman was Tyrone Bienemy.
During cross-examination, Aaron Clark admitted that he did not know Jonathan Veal and did not see him that night. He *787 saw only one gunman upstairs, who was wearing a mask that blocked his hair and his face from his nose down, but he knew that the man was Tyrone Bienemy. He explained that when he heard the confrontation in the hallway, he first thought it was Ms. Joseph and Dell arguing, but when he cracked the door he saw the gunman. He stated that at first he thought |12the gunman was “playing,” but then Lavante came out of his room and said he wanted to help his Uncle Dell. With respect to Dell’s safe, Aaron Clark testified that it was normally kept in the dining room, but he did not know what Dell kept in it.
Aaron Clark denied identifying Tyrone Bienemy based upon information that the police gave him. He agreed that he did not mention Tyrone Bienemy’s name in his statement to the police, explaining that a police officer told him that he could not say that the gunman was Tyrone Bienemy because the gunman was wearing a mask. He also admitted he did not mention Tyrone’s name in the 911 call. He stated that he identified a photograph that contained several pictures including one of Tyrone Bienemy after he gave his statement, and he pointed out Tyrone Bienemy’s photo. Aaron Clark denied knowing Dell’s Uncle Milton or a man named Duck or August, who purportedly wanted to kill Dell because of money that Dell had taken from him. He also denied seeing anyone come to the house with a gun, looking for Dell.
Lavante Riley testified that he lived with his grandmother and was in the house the night that his Uncle Dell was killed. The State played the video of a statement that Lavante gave at the Child Advocacy Center. Lavante explained that at the time of the murder, Uncle Dell was staying in his room, and he was staying with his sister Lashanti in her room.
On cross-examination, Lavante testified that only his Uncle Dell opened the safe. Although he did not know what was in the safe, Lavante saw his uncle put money inside it. On the night of the shooting, he saw the girl (presumably Ms. Croft) walking back and forth between Uncle Dell’s room and the bathroom with her cell phone, and then he thought that she went downstairs. He stated that his | ^grandmother came out of her room to check on him, and he saw the girl go into his uncle’s room, while his grandmother asked someone standing in the dark who he was. The man did not answer. She walked toward him, and the man backed up. His grandmother turned on the light, and the man pulled a gun. The man told his grandmother to get on the ground, and then his grandfather (presumably Aaron Clark) came out of the other bedroom, and the gunman trained the gun on him. La-vante testified that he tried to run to his uncle’s room to help him, but his grandmother held him back. He stated that the girl was in the room with his uncle, but he did not see anyone else in there.
Lavante testified that in his statement, he mentioned that the door to his room was open as he went out the window, and he could see his Uncle Dell and at least one man fighting. He stated that when he and his grandparents went into his sister’s room, the gunman turned and went toward his uncle’s room, and he could see his uncle fighting with one of the men by the door to the room. He stated that he saw Tyrone Bienemy upstairs and saw Jonathan Veal as he was running away from the house. He admitted that he did not identify Tyrone Bienemy in his statement, but he explained that no one asked him who the perpetrators were. He then stated that his grandmother said that the perpetrators were Jonathan and Tyrone. He stated that he heard his grandmother and his uncle’s friend Mooda talking about *788 the murder after talking with the police. She asked Mooda whom he knew who was “big,” and then she said that Tyrone was the big man. Lavante testified that while they were watching television later, they saw a photo, and his grandmother told him that the person was Jonathan. He stated that his grandmother told him that although she could not tell him anything about what | ^happened, she told him who did it. He admitted that he did not see the girl let the perpetrators into the house.
Detective Orlando Matthews was involved in the investigation of Randell Riley’s murder. Soon after arriving on the scene, he spoke with people inside the house who gave him the name Tyrone and Tyrone’s mother’s phone number. He called the number and spoke with her briefly, and she told him that someone had already called her concerning the murder. He went to her house, and Tyrone was not there. However, Tyrone called while the detective was there, and he agreed to meet Detective Matthews at the house in thirty minutes. Detective Matthews testified that he waited over an hour, but Tyrone Bienemy did not appear.
Detective Matthews admitted on cross-examination that Jonathan Veal’s name did not come up while he was there. He stated that he did not author any police reports, but he gave his notes to Detective Beckett, who was the lead investigator. He then turned over his notes to the defense and to the State.
Chelsea Croft testified with the help of an interpreter. She admitted knowing the defendants and the victim. She stated that she first met the defendants when she was working at a fast food restaurant; she did not remember where she met Randell Riley. She identified both defendants and testified that Tyrone Bienemy asked her to let him and Jonathan Veal into Randell Riley’s house so that they could rob him. She stated that she was at Tyrone Biene-my’s mother’s house when he asked her to do this, and Tyrone Bienemy’s girlfriend was present at that time. She stated that they went to Jonathan Veal’s house, left to get food, and then returned to Jonathan Veal’s house. She stated that the defendants dropped her off at another fast food restaurant, where she called Randell Riley to come and get her. She insisted that she saw no guns in the defendants’ car, but she knew that they | ^intended to rob Randell Riley because she heard them talking about it at Jonathan Veal’s house.
Randell Riley picked her up and took her to his house, where they watched movies until Randell Riley went to bed. She went into the bathroom and then downstairs to open the door for the defendants. She then went back upstairs and into Randell Riley’s bedroom. She stated that Jonathan Veal came into the room with a gun, and he and Randell Riley fought. Then Tyrone Bienemy, who remained at the doorway, fired, and Randell Riley was shot. She stated that the defendants fled, and she was uncertain where Randell Riley went. She stated that she called her friend Bruce, who picked her up from a nearby gas station approximately fifteen minutes later.
Ms. Croft insisted that she did not know that the defendants intended to kill Randell Riley; they only told her that they were going to rob him. She did not remember either defendant telling her to go into Randell Riley’s room. She admitted that she pled guilty to manslaughter in connection with Randell Riley’s murder, and she agreed to testify against the defendants in order to get a lesser sentence. She insisted that she was telling the truth and that the State would charge her with second degree murder if she lied.
On cross-examination, Ms. Croft admitted that she was told that her plea deal *789 would be void if she changed her story. She stated that Tyrone Bienemy’s gun fired three or four times. She admitted that she only spoke to Tyrone Bienemy about the robbery, but she heard him and Jonathan Veal discussing it. She stated that Detective Beckett scared her when she gave her statement, and she did not use an interpreter during the statement. She stated that Detective Beckett did not question her about her friend Bruce. She denied orchestrating the murder, |, (-.admitting only that she let them inside the house. She admitted that Randell Riley was involved in writing bad checks and defrauding some people, and she helped him in this scheme, but she did not tell Detective Beckett about this activity. She denied knowing anyone named Duck or August who was looking for Randell Riley. Ms. Croft admitted that she was pregnant at the time of the murder, but she insisted that the father of the child was none of the men involved in the murder or its aftermath. She insisted that she had no aliases, but she admitted that she was known as Puerto Rican Passion when she worked at a club. On redirect, she stated that she was in shock when Randell Riley was shot. She denied that Bruce was ever in Randell Riley’s house or was involved in the shooting.
Officer Charles Stamps testified that he extradited Tyrone Bienemy from Harris County, Texas on August 26, 2009, and Jonathan Veal from Atlanta, Georgia on October 6, 2009. He admitted on cross-examination that he did not know if Jonathan Veal lived with his brother in Atlanta.
The parties stipulated that if Detective Beckett were to appear, she would testify that officers found inside the residence, under furniture, something called a lamp cover and a Louisiana identification card in the name of Jonathan Franklin. They also stipulated that Detective Beckett would testify that she directed Daniel Dooley of the Child Advocacy Center to show La-vante a photograph of Tyrone Bienemy during his interview. They further stipulated that Detective Beckett directed that the mask and glove found at the scene be tested for trace evidence; that the glove yielded the presence of human blood and possible DNA; and that the mask yielded the presence of human blood, the possible presence of DNA, and one hair with possible follicular tissue.
JjjDISCUSSION
Errors Patent
A review of the record for patent errors reveals one error with respect to Tyrone Bienemy’s sentence. The court sentenced him as a double offender to serve eighty years at hard labor, but it failed to note that the sentence was to be served without benefit of probation or suspension of sentence as mandated by La. R.S. 15:529.1G. However, as per La. R.S. 15:301.1A and State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with these restrictions of benefits, even in the absence of the trial court’s failure to delineate them. Thus, there is no need for this Court to correct the sentence. See State v. Barnes, 2011-1421 (La.App. 4 Cir. 9/19/12), 100 So.3d 926; State v. Phillips, 2003-0304 (La.App. 4 Cir. 7/23/03), 853 So.2d 675.
Assignments of Error
I.
By Tyrone Bienemy’s first assignment of error and Jonathan Veal’s only assignment, they contend that there was insufficient evidence to support their manslaughter convictions. They do not dispute that a manslaughter occurred; rather, each asserts that the evidence did not prove his *790 identity as one of the perpetrators of the manslaughter.
In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). See also State v. Brown, 2003-0897 11s(La.4/12/05), 907 So.2d 1; State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 2004-1199 (La.App. 4 Cir. 3/9/05), 900 So.2d 156. In addition, when the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657. See also Brown; Batiste; Sykes.
Although the defendants were charged with second degree murder, the jury found them both guilty of manslaughter, which is defined in La. R.S. 14:31 in pertinent part as: “(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.” Second degree murder is defined in pertinent part by La. R.S. 14:30.1A(2) as the killing of a human being: “When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery ... even though he has no intent to kill or inflict great bodily harm.” The victim in this case was shot and killed during an armed robbery, thus satisfying the elements of manslaughter.
The defendants argue, however, that the evidence did not prove beyond a reasonable doubt that they were the perpetrators. In State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639, this Court set forth the standard for determining whether the evidence was sufficient to prove identity as the perpetrator:
When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 119307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893; State v. Woodfork, 99-0859 (La.App. 4 Cir. 5/17/00), 764 So.2d 132. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness? degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. See State v. Brealy, 2000-2758 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116.
See also State v. Williams, 2011-0414 (La.App. 4 Cir. 2/29/12), 85 So.3d 759;[3] State v. Mathieu, 2007-0204 (La.App. 4 Cir. 2/27/08), 980 So.2d 716. In addition, as noted by this Court in State v. Jones, 2011-0649, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 608, 611[4]: “In the absence of *791 internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291,1293.”
Here, Patricia Joseph, Aaron Clark, and Lavante Riley all identified Tyrone Biene-my as the man who stood with the gun in the hallway outside the victim’s bedroom. In addition, Chelsea Croft identified Tyrone Bienemy as the man in the hallway and Jonathan Veal as the man who went into the victim’s bedroom and struggled with him. She also testified that Tyrone Bienemy fired his gun three or four times, striking the victim.
|20Both defendants argue, however, that these identifications are suspect. They point out that there was no physical evidence to tie them to the murder. With respect to the victim’s family members who were in the house, Tyrone Bienemy argues that they did not give his name to the police in the 911 call; instead, they indicated that they did not know who the perpetrators were because the perpetrators were masked. Tyrone Bienemy asserts that they did not come up with his name until after conferring with the victim’s friend, who gave them his name because he fit the general description of the man in the hallway. He points to the fact that Ms. Joseph agreed that the portion of the gunman’s face that was visible from the mask would have showed his moles and a scar, yet Ms. Joseph did not indicate in her statement that the gunman had these marks.
Nonetheless, Ms. Joseph testified that even if she did not give Tyrone Bienemy’s name to the police, she knew it was him, having known him for years. She also testified that when the gunman backed them into the children’s room, he told Lashanti not to look at him because she knew him. In addition, Aaron Clark testified that although it did not dawn on him at the time and shortly after the murder that the gunman was Tyrone Bienemy, when he calmed down he remembered hearing Ms. Joseph ask “Tyrone” why he was pointing the gun at them while they were in the hallway. He insisted that he told an officer on the scene that the gunman was Tyrone, but he stated that he did not mention Tyrone’s name in his statement to the police because an officer told him that he could not do so because the gunman was masked. Although Lavante Riley also identified Tyrone Bienemy as the man in the hallway, he admitted that his grandmother told him who the perpetrators were.
121 With respect to Chelsea Croft’s identification of both defendants, they both theorize that she merely agreed with Detective Beckett’s assertion that they were the perpetrators in order to hide her own culpability and that of the father of her unborn child, whom she denied was any of the men involved in the robbery or her departure from the scene. The defendants argue that Ms. Croft admitted that she was threatened by Detective Beckett, and they assert that her mental condition was questionable. It is unclear upon what they base the latter argument because her mental condition was not raised at trial. They point out that Ms. Croft pled guilty in exchange for her testimony against them, and she admitted that her plea deal would be invalidated if she changed her testimony at trial.
The jury was aware of all of these factors, and it still chose to believe the witnesses’ identification of the defendants *792 as the men who attempted to rob the victim, during which robbery he was repeatedly shot and killed. Unlike this Court, the jurors were able to observe the demeanor of the witnesses and found them to be credible. A fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 2009-0259 (La.App. 4 Cir. 9/16/09), 22 So.3d 205; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. Contrary to the defendants’ arguments, the record does not show that the jurors abused their discretion in their credibility finding. This finding is bolstered by the testimony of Ms. Brumfield, who placed Ms. Croft with both the defendants on the night of the murder, testifying that Ms. Croft left with the defendants just prior to the murder. Although the defense theorized that the victim was killed as a result of someone whom the victim had defrauded through his check writing scheme, with which Ms. Croft admitted being |22partially involved, there was no evidence to support this theory, and the jury did not abuse its discretion by rejecting this theory.
Looking at the Manson factors, the family members knew Tyrone Bienemy prior to the murder, but they did not know Jonathan Veal, and none of them identified him as being at the scene. The gunman in the hallway had a mask on, but Ms. Joseph insisted that she recognized Tyrone Biene-my’s eyes. She and Aaron Clark were focused on the gunman. The descriptions that they gave of the perpetrators was very general: two black men, one with a white shirt, and the one in the hallway being big. They were both certain at trial, a year and a half later, that Tyrone Biene-my was the gunman in the hallway.
While a review of the Manson factors with respect to their identifications might not be sufficient to prove that the defendants were the perpetrators, Ms. Croft, who admitted the perpetrators to the house, positively identified them as the perpetrators. She had plenty of opportunity to view them, and her degree of attention was great, as she was a part of the robbery plan. It is unclear if she ever gave a description of them, but she was certain that they were the men whom she let into the house to rob the victim. She identified them when she gave her statement, which occurred a few days after the murder.
Considering all of the evidence adduced at trial, the State presented sufficient evidence for the jury to find beyond a reasonable doubt that the defendants were the men who attempted to rob the victim and shot him during the robbery. This assignment has no merit.
II.
By his second assignment, Tyrone Bien-emy contends that the trial court imposed an excessive sentence. The court sentenced him on his manslaughter | ^conviction as second offender to serve eighty years at hard labor, the maximum sentence he could have received. See La. R.S. 14:31; 15:529.1.
In its response, the State argues that this issue is not preserved for appeal because Tyrone Bienemy did not file a motion for reconsideration of sentence as contemplated by La.C.Cr.P. art. 881.1. In support, it cites State v. Jenkins, 2009-1551 (La.App. 4 Cir. 6/30/10), 45 So.3d 173; and State v. Mosley, 2003-1947 (La.App. 4 Cir. 4/14/04), 872 So.2d 1220; and State v. Rodriguez, 2000-0519 (La.App. 4 Cir. 2/14/01), 781 So.2d 640, wherein this Court noted that the failure to file a motion to reconsider sentence or object to the sentence does not preserve an excessive sentence claim. While Tyrone Bienemy did not file a motion to reconsider sentence, *793 his counsel noted his objection to the sentence when the court imposed it. This objection preserved his excessive sentence claim. See State v. Caldwell, 620 So.2d 859 (La.1993), where the Court found that an objection at the time of sentence acted as an oral motion to reconsider, obviating the need for filing a written motion. See also State v. Soraparu, 96-0116 (La.App. 4 Cir. 2/5/97), 688 So.2d 1320. Contrary to the State’s assertion, counsel’s objection when the court imposed the sentence preserved the issue for appeal.
The Supreme Court set forth the standard for evaluating a claim of excessive sentence in State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to • • • excessive ■ • • punishment.” (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when | ^imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
See also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973; Williams; State v. Batiste, 2006-0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810. This Court in Batiste, at p. 18, 947 So.2d at 820 further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra [871 So.2d 1235 (La.App. 4 Cir.2004) ]; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Landos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Landry, 2003-1671 at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
*794 |2fiHere, before imposing sentence on the multiple bill, the court first noted that it had obtained a presentence investigation report. It stated that it had given several reasons for imposing the original sentence, and it then reiterated these reasons. The court listed Tyrone Bienemy’s prior convictions and juvenile adjudications. It noted that his criminal history began when he was twelve years old, and he had delinquency adjudications in 1998 for unauthorized use of a movable and in 2001 for carrying a concealed weapon. The court then listed his adult convictions: theft of goods from Jefferson Parish in 2001 for which he received probation; unauthorized use of a movable from DeSoto Parish in 2005 for which he received probation; illegal carrying of a weapon in Orleans Parish in 2006 for which he received probation; possession of marijuana, first offense in Orleans Parish in 2008 for which he received probation; possession of marijuana, third offense in Jefferson Parish in 2008 for which he received probation; and another conviction for simple possession of marijuana in Orleans Parish in 2009 for which he was sentenced to serve twenty-five days in parish prison. The court noted that the jury unanimously convicted him of manslaughter, but the court felt that the evidence proved that he committed second degree murder as charged.
The court looked to the factors of art. 894.1 and found that none of the mitigating factors applied to Tyrone Bienemy’s case. The court noted that Tyrone Bienemy’s criminal history showed an escalation of violence. The court then listed the aggravating factors that applied: he exhibited “deliberate cruelty” to children and older adults, even to the point where the victim’s mother felt it necessary to jump from a second floor "window with her grandchild to escape Tyrone Bienemy; he created a risk of harm to more than one person; he exhibited threats of violence |2r,and actual violence to the victim’s family; and he used a dangerous weapon. Finding that any lesser sentence would deprecate the seriousness of the offense, the court vacated the previous sentence of forty years and imposed the maximum sentence of eighty years at hard labor. Counsel objected to the sentence.
Thus, the court adequately complied with art. 894.1. Moreover, a comparison of the facts of this case with similar cases shows that the court did not abuse its discretion by imposing the maximum sentence. For example, in State v. Kelson, 2009-0204 (La.App. 4 Cir. 6/9/10), 40 So.3d 194,[5] the defendant and a companion viciously beat and stomped the victim, and then left him to die in a dumpster. The court also noted that the defendant had prior convictions.
Likewise, in State v. Walker, 99-2868 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, this Court upheld an eighty-year sentence imposed for a conviction for manslaughter as a second offender. The defendant, charged with second degree murder, was convicted of manslaughter. He had confessed to strangling a woman who began hitting and pushing him after they had smoked crack cocaine and had sex, when he told her that he had no more money or crack cocaine. Although he had only one prior conviction for theft valued at more than five hundred dollars, he had a lengthy history of arrests, including seven prior arrests (but no convictions) for aggravated and/or assault offenses. In addition, family members indicated that he was capable of inflicting bodily harm, including a report by his sister that he had a tendency to *795 fight women, and that he had confessed to her that he had killed his own grandmother.
127Tyrone Bienemy insists, however, that his sentence is excessive, and he cites two cases where a defendant convicted of manslaughter received drastically lesser sentences. However, in each of these cases, the defendant was sentenced as a first offender, rather than as a second offender as the court adjudicated Tyrone Bienemy. In State v. Brown, 35,641 (La.App. 2 Cir. 8/20/08), 852 So.2d 1234, the defendant smoked cocaine with the victim in a secluded area and then beat, strangled, and drowned her. He had prior convictions for forgery, carnal knowledge of a juvenile, simple battery, and conspiracy to distribute cocaine and marijuana. The appellate court rejected his claim that his twenty-year sentence as a first offender was excessive. Likewise, in State v. Taylor, 35,-921 (La.App. 2 Cir. 4/3/02), 813 So.2d 1151, the defendant shot the victim twice after having sex with him when the victim indicated that he wanted to have more sex. The defendant was seventeen at the time of the offense and had some criminal history. The appellate court found that his twenty-two-year sentence as a first offender was not excessive. In each of these cases, the court found that the sentence imposed was not excessive; in neither case did it find that any greater sentence would be excessive.
Here, unlike in the cases cited above, the court adjudicated Tyrone Bienemy a second offender and imposed sentence in accordance with that adjudication. Although his sentence is much greater than those affirmed in Brown and Taylor, the defendants in those cases were sentenced as first offenders. Given the maximum sentences upheld by this Court in Walker and Kelson, it does not appear that the trial court abused its discretion by imposing the maximum sentence of eighty years as a second offender. It must be noted that the standard of review is not whether this Court might think that another sentence would be more suitable; |2athe standard is whether the trial court abused its discretion in imposing the sentence that it imposed. Applying Walker and Kelson, we find that the trial court did not abused its discretion in this case. This assignment has no merit.
CONCLUSION
The evidence was sufficient to support the manslaughter convictions of both Tyrone Bienemy and Jonathan Veal. In addition, the trial court did not abuse its discretion by imposing Tyrone Bienemy’s eighty-year sentence. Neither of the defendants’ assignments of error has merit. Accordingly, we affirm Tyrone Bienemy’s and Jonathan Veal’s convictions and sentences.
AFFIRMED

. Ms. Croft is not a party to this appeal.

. The custodian of the 911 tape identified the tape, and the State played it. After listening to the tape the custodian agreed that the woman on the tape, who identified herself as the victim's mother, said that she did not know who shot the victim because the perpetrators wore masks. The mother also stated that two men burst into her son’s room and shot him. The woman described the perpetrators as two black men, one wearing a white shirt.

. Writ den. 2012-0708 (La.9/21/12), 98 So.3d 326.

. Writ den. 2011-2545 (La.3/30/12), 85 So.3d 116.

. Writ den. 2010-1575 (La.1/14/11), 52 So.3d 901; cert. den. Kelson v. Louisiana, — U.S. -•, 131 S.Ct. 2941, 180 L.Ed.2d 233 (2011).