MAX N. TOBIAS, JR., Judge.
hOn 7 April 2011, the state indicted the defendant, Joseph Peters (“Peters”), and codefendants, Derrick Allen (“Allen”) and Jazmun Tolbert (“Tolbert”), with one count of second degree murder.[1] Peters pleaded not guilty on 12 May 2011. A hearing on motions was held on 28 October 2011; the trial court found probable cause and denied Peters’ motions to suppress evidence and identification. On 24 January 2012, on joint motion, trial was continued to 10 April 2012. On 2 April 2012 Allen elected a trial by judge. Thereafter, on 10 April 2012, the state filed a motion to sever Allen’s case from Peters’; it also sought to sever Tolbert’s case from Peters’. According to a minute entry, Peters refused the state’s offer of a plea bargain. Trial was again continued on a joint motion. On 12 June 2012, Peters elected a trial by jury, and trial began with jury selection. Peters’ trial was held on 12-15 June 2012. The jury found Peters guilty of manslaughter, a violation of La. R.S. 14:31. Peters filed a motion for a new trial and motion for post-verdict judgment of acquittal on 20 June 2012, as well as a motion to reconsider sentence, all of which the trial court denied. The trial court sentenced Peters to forty years at [2hard labor with credit for time served from 26 October 2010, to run concurrently with any and all sentences. According to the 25 July 2012 minute entry indicating that it was an amended 20 June 2012 entry, the trial court granted Peters’ motion for appeal on 20 June 2012.
I.
Latoya Dugay, a 911 operator and the custodian of records in the 911 department, testified that she takes calls from witnesses reporting incidents, types up an incident recall (with an item number), and sends the recalls to the dispatcher. She stated that she had reviewed the incident recalls and 911 radio dispatch recordings for item numbers 3-3353110, 3-3352710, and 3-3353610, consisting of (1) incident recalls of the 911 calls on 25 October 2010; *309 (2) an incident recall of dispatcher talking to police officer in the field; (3) a disk recording of the 911 calls; and (4) a disk recording of dispatcher providing information to a police officer. The 911 tape and the recording of the dispatcher’s call to an officer were played for the jurors. Ms. Dugay stated that she had not listened to the recordings that day, but she recognized the voices when it was played in court. She agreed that she had heard the caller say that there were “four black males” in the recording, but the incident recall did not indicate that there were four shooters. She explained that the number in the recording referred to the subjects at large, not the ones apprehended. The incident recall noted three apprehensions.
Dr. Cynthia Gardner, a forensic pathologist with the Orleans Parish Coroner’s Office, was accepted as an expert, and testified that she performed an autopsy on Sedale Dorsey, the victim, on 26 October 2010 and prepared the autopsy protocol. The protocol was introduced in evidence. She stated that, prior |sto the incident, the victim had been a paraplegic confined to a wheelchair. She found three older bullets that were positioned very near Mr. Dorsey’s spinal column, which gunshots probably caused his paralysis. The doctor noted that Mr. Dorsey’s right kidney and right adrenal glands were absent (surgically removed). As to the current injuries, Dr. Gardner testified that the victim had fourteen acute gunshot wounds. Two of the wounds were to the head, one of which went through the head and exited; the wounds caused injury to the soft tissue of the victim’s face and eye, as well as fractures to the skull and bleeding around the surface of the victim’s brain. Ten wounds were to Mr. Dorsey’s torso, which caused injury to his spinal column and the large vein in his upper chest, as well as injuries to both of his lungs and an extensive injury to his heart. The last two gunshot wounds injured his right hand and forearm, injuring only soft tissue. Dr. Gardner stated that Mr. Dorsey “died as a result of these multiple gunshot wounds.” She explained the paths of the bullets and the damage they caused; an enlarged copy of a page of the autopsy protocol was shown to the jury. The doctor said that all bullet entrance wounds were on the victim’s back, and some wounds indicated that Mr. Dorsey was sitting down (presumably in his wheelchair). Dr. Gardner said that she recovered one bullet from the victim’s skull and five from his torso. She stated that the guns were fired at a distance from the victim, at least two feet, because she found no gunpowder stippling (unbumed flakes of gunpowder around the entrance wounds that would have been present if the gun had been within two feet of Mr. Dorsey). She stated that once a shot is fired more than two feet away, there is no way to know the exact distance. Dr. Gardner explained the entry and exit wound of each bullet that exited the body and marked each of those on the enlarged diagram of the victim’s body.
|4Sergeant Irving Gasper, an eighteen-year veteran of the New Orleans Police Department (“NOPD”), testified that on 25 October 2010 he responded to a 34-S, which is an aggravated battery by shooting. He was the first officer at the scene at St. Andrew and South Liberty Streets. He observed a black male seated in a wheelchair with apparent gunshot wounds. The victim was about twenty feet from the intersection, positioned directly behind a parked blue Dodge minivan. The sergeant observed a lot of blood on the front of the victim’s body and multiple gun casings on the ground around the victim. Sergeant Gasper indicated that the victim’s back was positioned toward the street. He began stringing the crime scene with tape and talked to the large number of people *310 at the scene (about 150), but he could not find any witnesses to the drive-by shooting.
Detective Justin Rice of the Homicide Division testified that he was the lead investigator in the murder; twenty-seven spent casings were recovered from that scene. The second crime scene was in the 7800 block of Fig Street, where a Chrysler Sebring automobile crashed into a house, and its occupants, who were suspects in the drive-by shooting, jumped out of the vehicle and fled. Two suspects were apprehended there. One gun was recovered within a suspect’s flight path. The detective said that he located two witnesses, who were reluctant to cooperate. Detective Rice said that he spoke to the two Orleans Parish Sheriff’s deputies who were executing an arrest warrant when they heard the gunshots nearby. The deputies headed to investigate, but a Chrysler Sebr-ing sped in their direction before the driver threw the car into reverse and sped away. The deputies followed the Chrysler until NOPD units took over the lead. Detective Rice said that the dashboard cameras (“cams”) on the NOPD units captured the high speed chase. [{¡Detective Rice contacted Sergeant Henry Burke of the mobile data unit, and he obtained the video footage for the detective.
Detective Rice said that a Glock 19 pistol, which was discarded by Peters, was recovered in the 8200 block of Fig Street, and a Glock 27 pistol was recovered in the 7800 block of Fig Street, which was in the flight path of the suspects. A Glock 17 was found in the Chrysler Sebring. The detective submitted a ballistics request so that the three firearms would be compared to the spent casings at the scene of the homicide. He requested that the weapons be swabbed for any DNA, that Detective Tim Bender apply for a search warrant for the Chrysler, had the vehicle dusted for latent fingerprints. Detective Rice learned that Officer Kevin Wheeler had used his Taser on Peters, and the detective had that officer’s Taser video downloaded. The detective obtained a search warrant for Peters and Allen; he used buccal swabs to obtain samples of their DNA.
On cross-examination, Detective Rice said that he obtained four videos from the dashboard cams on the police units. He stated that Tolbert was not arrested until a few months after the shooting when a DNA hit was obtained on CODIS for the DNA taken from the Glock discarded in the 7800 block of Fig Street. He stated that Tolbert and Allen had been victims in an earlier shooting. Detective Rice stated repeatedly that he knew of no crime cameras in the area of the chase or the drive-by shooting. The detective acknowledged that initially the 911 callers insisted that there were four perpetrators, but after talking to the deputies, the witnesses, and the NOPD officers, “it was relayed to me that there was [sic] only three.” He stated that the victim’s recovered cellphone was smashed and yielded no information.
[fiOn redirect examination, Detective Rice testified that the lead police vehicle had a dashboard camera (“cam”) that showed the chase. Videos from four dashboard cams showed the entire chase. The detective said that the guns that were used to kill Mr. Dorsey were found. Detective Rice said that he interviewed Deputy Braun, who had said that there were four suspects, and he then stated that “he saw three subjects inside the vehicle and there was possibly a fourth but he was unclear.” He said that two suspects were apprehended that day. Detective Rice testified that he spoke to Officer Chantelle Minor, who had been involved in the apprehension of the suspects. Officer Minor reported that two suspects were apprehended; one was apprehended on a roof, and she had *311 helped to arrest Peters. The officer explained that she had stopped a third subject, but he was “a mentally challenged person who was outside at that time.” Only two were apprehended that day. Tolbert was apprehended months later. The detective explained that he was taught how to swab a subject’s cheek in order to obtain a DNA sample, but he knew nothing about DNA analysis. He said that a note found in the victim’s pants had no evidentiary value to the case. The detective told defense counsel that he did not get the name of the “mentally challenged” man because Officer Minor had immediately released him.
Deputy Daniel Hirseh testified that at about 6:25 p.m. on 25 October 2010, he and his partner, Deputy Braun, along with a sergeant, were serving warrants on Josephine Street when they heard several gunshots; then, after seconds, they heard a large volley of gunshots. The deputy headed to his vehicle and executed a three-point turn on Josephine (a one-way street). By then a Chrysler Sebring, which was traveling at a high speed, turned onto Josephine from South Liberty; the driver then saw the deputies’ car blocking the way. The Chrysler stopped and the driver threw |7it into reverse, traveling backwards very fast until he was past South Liberty. Then he made a right turn onto South Liberty heading westbound toward Jackson Avenue.
Deputy Hirseh stated that he pursued the vehicle while Deputy Braun handled radio communications. While he was the lead police unit behind the Chrysler, the Chrysler did not stop, traveling at a high rate of speed, ignoring all traffic lights and stop signs. Deputy Hirseh said that when the Chrysler hit Second Street and South Claiborne Avenue, a NOPD vehicle was positioned on the neutral ground. That unit jumped out behind the Chrysler and became the lead unit; Deputy Hirseh fell back into second position. As more NOPD units arrived, he was falling farther and farther back in the line, but he continued to follow the Chrysler. When he arrived at the crash scene, he saw one suspect, later identified as Peters, in custody, sitting on the steps of a residence and a weapon on the sidewalk of a side street. Because Peters appeared agitated, Deputy Hirseh and his partner took him and placed him in the back of their car. Deputy Hirseh identified Peters as that suspect. He acknowledged that no dashboard cam was present on his cruiser. The deputy said that he could not recall telling the 911 operator that there were four suspects in the Chrysler, but he really saw only two suspects, one in the driver’s seat and one in the back seat behind the driver. He was focused only on keeping up with the Chrysler and not having an accident.
Deputy Terry Braun corroborated Deputy Hirsch’s testimony that they were serving warrants in the 2200 block of Josephine Street when they heard two sets of gunshots seconds apart. The first was four or five rounds; the second was twenty or thirty rounds. When Deputy Hirseh was attempting to do a three-point U-turn, a silver Chrysler Sebring turned onto Josephine. When the driver of the Chrysler |8saw their marked car, he drove in reverse all the way back to turn onto South Liberty. Deputy Braun said that they pursued the vehicle, and Deputy Hirseh stayed right behind it until a NOPD unit took the lead position. Deputy Hirseh listened to the dispatch recording in which he said that there were four suspects in the Chrysler; he also agreed that he gave a statement saying that there were three or four suspects in the car. He said that he could not be positive because the suspects’ bodies were bouncing all over as the Chrysler was traveling at sixty-five m.p.h. on New Orleans streets. He identified the *312 video from the dashboard cam showing the rear of the Chrysler and the license plate that he called into the dispatcher.
Deputy Braun stated that when he arrived at the scene of the crash at Fig and Dublin Streets, he observed the Chrysler and a handgun on the sidewalk between the Chrysler and a police car. Police officers were tussling with Peters even though he was handcuffed for he was trying to pull away from the officers. Deputy Braun said that he and Deputy Hirsch took Peters and placed him in the back of their unit. On cross-examination, the deputy said that he did not see the shooting, saw no gunfire from the Chrysler, and saw no weapon thrown from the Chrysler. He stated that Peters had been “tased” before they arrived at the crash scene. He knew nothing about Officer Minor. Deputy Braun explained that he saw two suspects as the Chrysler was traveling toward their car. When they were behind the Chrysler, he could see one person in the back seat, but he could not be sure if another person was present.
NOPD Officer Kevin Wheeler testified that on 25 October 2010 he was working with Officer Jerry Devorak. They were on Martin Luther King Boulevard, heading towards South Claiborne Avenue, and made a right turn onto South Galvez Street when they heard a deputy on the radio saying that shots had |sbeen fired. Officer Wheeler said that they set up at the intersection of South Claiborne Avenue and Second Street, and that when the gray or silver Chrysler Sebring turned onto Claiborne to head downtown, they pulled in immediately behind it. Officer Wheeler acknowledged that they remained the lead unit until the Chrysler crashed into a house at the corner of Dublin and Fig Streets, when three suspects exited the car and fled on foot. Officer Wheeler testified that he used his vehicle to cut off one suspect, later identified as Peters. Peters ran back toward the Chrysler, and the officer exited his unit and pursued the suspect on foot. Officer Wheeler said that Peters removed a black firearm from his waistband, and the officer reached for his own gun. Peters, however, stumbled and fell; the firearm fell from his hand to the concrete sidewalk. The officer acknowledged that he then used a Taser to stop Peters. Officer Wheeler identified the video as coming from the dashboard cam of his unit, and the video was played to the jury. It showed a Sixth District officer handcuffing Peters while Officer Wheeler kept his Taser pointed towards Peters. The officer said that he walked back to where the handgun had been dropped on the sidewalk. He identified Peters in court.
On cross-examination Officer Wheeler explained that a camera was mounted on the bottom of his Taser. He knew that Officer Chantelle Minor had detained someone, but he did not know the suspect whom she had detained. He said that a firearm was found in the Chrysler, and another one was discarded during the chase, but he had nothing to do with those. Officer Wheeler stated that he saw only three individuals in the Chrysler, and three suspects exited the car after the crash. Officer Minor detained one suspect, and he detained Peters.
Officer Jerry Devorak corroborated Officer Wheeler’s testimony as to their involvement in the high speed chase on 25 October 2010 that ended in a crash. He | i0said that Officer Wheeler cut off Peters, and they pursued him on foot. Peters began to pull a handgun from his waistband, and Officer Wheeler put his hand on his own gun. When Peters started to stumble, the gun fell to the ground. Officer Devorak said that Officer Wheeler re-holstered his gun and took out his Taser, *313 which he used to incapacitate Peters, who then fell to the ground. Officer Devorak said that he then went down Dublin Street to Pritchard Place, where people on the street were pointing to a house. He and other officers surrounded the house, and an officer found Allen on the roof and arrested him. Officer Devorak identified Peters in court.
Veronica Manuel, an NOPD crime lab technician, processed the crime scenes at 2000 South Liberty Street where the drive-by shooting occurred, the 2900 block of Dublin Street where the Chrysler Sebr-ing crashed, the 7900 block of Fig Street where a Glock pistol was discarded, and 715 Broad Street where another Glock pistol was discarded. Photos of the crime scenes were introduced. Ms. Manuel collected ten .40-caliber casings, seventeen 9-mm casings, and one spent pellet. She identified the field test she conducted that night, a Gunpowder Residue Test (“GSR”) on Peters’ hands that was presumptively positive. Defense counsel read from the NOPD scientific information manual that indicated that a GSR collection must be outsourced for analysis; Ms. Manuel said that she only knew that she did the GSR test on Peters that night. Defense counsel attempted to discredit Ms. Manuel’s test. Ms. Manuel identified: the Glock 17 (with a jammed-live round stuck in chamber) that was recovered from the Chrysler Sebring, the Glock 19 that was recovered from the sidewalk in the 8200 block of Fig Street; and the Glock 27 that was recovered from the 7800 block of Fig Street.
InThe parties stipulated that Meredith Acosta, the firearms examiner for the NOPD Crime Laboratory, was an expert in the field of firearms examination. Ms. Acosta said that the sixteen 9-mm caliber shell casings found in the 2000 block of South Liberty were fired by the Glock 19; the ten .40-caliber casings from the 2000 block of South Liberty were fired by the Glock 27. After examining the bullets removed from the victim’s body, she stated that the copper jacketed projectiles were consistent with .38-caliber ammunition, which includes 9-mm ammunition; but she could not say more without the actual guns used. Two had characteristics of the .40-caliber Glock, but nothing more could be said. The projectile fragment had characteristics similar to a Glock’s, but she could not definitively say whether they were 9-mm or .40-caliber (because of similar characteristics). On redirect examination, Ms. Acosta testified that she tested 27 casings from the scene of the shooting, that all of those were fired by the three Glock semiautomatic pistols recovered, and that those results were beyond a reasonable doubt.
Troy Dickerson, a technician at the NOPD Crime Laboratory, was qualified as an expert in the taking of fingerprints and swabbing. He testified that he processed the Chrysler for latent fingerprints, but he did not know the result. He turned the fingerprints over to the latent fingerprint section of the police. Eight “possible” GSR samples were collected from the driver’s and the passenger’s sides of the Chrysler; thirteen photos of the car were taken. Mr. Dickerson said that he was not able to recover fingerprints from the Glock 17, the Glock 19 (save a partial latent print from the ejection port but not suitable for comparison), or the Glock 27. | ^Although the NOPD Crime Lab is not certified in DNA analysis, specimens can be sent to the Louisiana State Police, if necessary.[2]
Marja Porteous, who works at the Louisiana State Police Crime Lab, testified that she works in evidence intake. Detective Rice’s evidence under Item 3-3353110 and request for scientific analysis was re *314 ceived by her on 3 December 2010; she sealed the evidence and entered it into the system. Present were two possible DNA samples from the Glock 17, two from the Glock 19, and two from the Glock 27. She had buccal cell swabs from Peters and Allen.
Paul Berry, the State Police DNA Analyst, was accepted as an expert in DNA analysis and questioned by the defense. Mr. Berry testified that he worked on SP-013173-10 and generated a report. He stated that he was able to obtain a DNA profile from the swabs from the Glock 17 and the Glock 27 and the two reference samples from Peters and Allen. According to Mr. Berry, the DNA profile for the Glock 17 was a mixture; Allen was excluded as a contributor. Peters could not be excluded as a major contributor. Peters and Allen were excluded as contributors to the DNA from the Glock 27; the major profile was consistent with Tolbert. Mr. Berry reached no conclusion as to DNA on the Glock 19. He concluded that Tolbert was excluded from every gun, save the Glock 27.
Joseph Pollard was accepted by stipulation to be an expert in the field of latent fingerprint identification. The two fingerprints lifted from the rear driver’s side door of the Chrysler matched Allen’s fingerprints.

ERRORS PATENT

A review of the record reveals no errors patent.
| ^ASSIGNMENT OF ERROR NUMBER ONE
Appellate counsel argues that the state’s evidence is insufficient to prove that Peters committed manslaughter. Counsel contends that all the evidence was circumstantial. Under La. R.S. 15:438 the state has to exclude every reasonable hypothesis of innocence, and the state did not carry that burden of proof. The only issue at trial was whether Peters killed Sedale Dorsey. Counsel asserts that:
• No witness saw the drive-by shooting or identified the Chrysler Sebring as the vehicle used and from which the defendant exited after the crash.
• The state did not prove that Peters ran because he was involved in the shooting, asserting that he ran for another reason, “perhaps out of fear of the police.”
• Forensic examination of the bullets from the victim’s body and the three guns recovered did not definitively prove that that they were the weapons used to kill Mr. Dorsey.
• Although conceding that the gunpowder residue test performed on Peters showed that he had touched the gun, that test was in the field and only “presumptively positive;” a second outsourced laboratory test was never conducted as required.
• The state did not present evidence showing that a GSR test can prove that a particular person fired a particular gun.
• The DNA evidence linking Peters to the Glock 17, if considered reliable, only proved that Peters had touched the gun. The State Police DNA expert testified that the DNA profile from the Glock 17 was a mixture of DNA and |14Peters could not be excluded as a major contributor, but admitted that an unknown subject had also contributed to the DNA found on that gun.
• No helpful fingerprints were found on the guns, on the bullets, or in the Chrysler to prove that Peters was in the car or shooting a gun.
• Two fingerprints on the car matched Derrick Allen.
*315 In its brief, the state argues that the verdict is amply supported by the law and the evidence. Criminal Sheriffs deputies and Braun testified that they were executing arrest warrants when they heard a large number of gunshots. As they headed for their vehicle and Deputy Hirsch made a U-turn, the driver of a gray Chrysler Sebring turned onto Josephine Street, saw their marked unit blocking the way, and drove in reverse all the way back to a street where a turn could be executed. The deputies chased the Sebring, and they were the lead unit until an NOPD unit jumped in and became the lead chase unit. Officers Wheeler and Devorak testified that they were in the lead NOPD unit chasing the Chrysler Sebring until it crashed. When the Chrysler crashed, Peters ran from it. Officer Wheeler said that he blocked Peters’ path with his unit, and then he and Officer Devorak followed Peters on foot. Officers Wheeler and Devo-rak were running right behind Peters as he pulled a Glock pistol from his waistband. When he stumbled and fumbled the Glock, which fell to the ground, Officer Wheeler used a Taser to incapacitate Peters. The state argues that even if Peters’ flight from the crashed Chrysler could be otherwise explained (as defense counsel claims), one must consider other evidence that supported the case against Peters:
• The behavior of the Chrysler’s driver (and occupants) speeding away from something (if not the drive-by shooting scene) and recklessly driving at high speeds on New Orleans streets, ignoring traffic lights and stop signs.
11S* Peters’ pulling out a Glock pistol during his flight from NOPD officers right behind him.
• The finding of gunpowder residue on Peters’ hands (even if only presumptively positive) on the night of the shooting.
• Peters’ DNA was linked to the Glock found on the front seat of the Chrysler.
Peters was charged with second degree murder, a violation of La. R.S. 14:30.1, which provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
[[Image here]]
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
The jury found Peters guilty of manslaughter, a violation of La. R.S. 14:30.1, which provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an 11fiaverage person’s blood would *316 have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
[[Image here]]
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim killed was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.
In State v. Taylor, 12-0845, p. 9 (La.App. 4 Cir. 6/26/13), 118 So.3d 65, 77-78, quoting State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, this court once again explained the standard of review for sufficiency of the evidence:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which |17the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438.
This Court went on to state:
Additionally, when a key issue is the defendant’s identity as the perpetrator, the State is required to negate any reasonable probability of misidentification. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Galle, 11-0930, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935.
Taylor, p. 9, 118 So.3d at 77. See also State v. Veal, 12-0712 (La.App. 4 Cir. 5/1/13), 116 So.3d 779, quoting State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639 (“When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 ...”); State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893.
In State v. Holmes, 05-1248, pp. 8-9 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1162, this court fully discussed the standard to be used when a defendant disputes his identity as the perpetrator of an offense:
*317 When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidenti-fication in order to carry its burden of proof beyond a reasonable doubt. State v. Bright, 1998-0398 (La.4/11/00); 776 So.2d 1134, 1147. The fact-finder weighs the respective credibilities of the witnesses, and a reviewing court will generally not second-guess those determinations. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). However, the touchstone of Jackson v. Virginia is rationality and that “irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.” State v. Mussall, 523 So.2d 1305, 1310 (La.1988). The trier of |isfact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses. State v. Hampton, 98-0331 (La.4/23/99); 750 So.2d 867, 880.
Here, Peters was inside the Chrysler Sebring when the car was speeding towards the vehicle of the Criminal Sheriffs deputies and away from the location where a number of shots had just been fired; the Chrysler never stopped. The Chrysler driver recklessly reversed and sped away from the deputies at high speeds over the streets of New Orleans, but Deputies Hirsch and Braun were right behind the Chrysler. NOPD Officers Wheeler and Devorak moved into the lead position and stayed right behind the Chrysler until it crashed; they saw Peters run from the vehicle. Their NOPD unit had a cam recorder that videotaped the chase, the crash, and Peters’ exiting the Chrysler.[3] Officer Wheeler blocked Peters’ path with his unit, and Peters ran the other way; Officers Wheeler and Devorak ran right behind him. The officers followed Peters, who at one point pulled a Glock from his waistband. When Peters dropped his gun, Officer Wheeler put his gun away and used his Taser to incapacitate Peters. Police officers or deputies never lost sight of the Chrysler during the high speed chase. The GSR field test was presumptively positive for gunpowder on Peters’ hands, and his DNA could not be excluded as a major contributor to that found on the Glock 17 recovered from the front seat of the Chrysler. The testimony of the deputies and NOPD officers negated any reasonable probability of the misidentification of Peters as one of the shooters who killed Mr. Dorsey.
119This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO

Appellate counsel argues that the maximum forty-year sentence for manslaughter was excessive under the circumstances of this case because maximum sentences are reserved for the worst kind of offenders. Counsel argues that the trial court did not give adequate consideration to the sentencing guidelines in La.C.Cr.P. art. 894.1. Counsel admits that if the trial court considered La. C.Cr.P. art. 893.3 E, the minimum sentence is twenty years ■with the maximum of forty years. Defense counsel correctly notes that in the sentencing transcripts of 20 and 26 June 2012, the trial court did not mention the codal article. Counsel seeks to have the *318 forty-year sentence vacated and the case remanded for resentencing within constitutional limits.
Contrariwise, the state notes that Peters was charged with second degree murder, and the maximum sentence under that statute is life imprisonment without benefit of parole, probation, or suspension of sentence. Peters was convicted of manslaughter, which carries a maximum sentence of forty years. The state concedes that under La. C.Cr.P. art. 893.3 E, Peters faced a sentencing range of twenty to forty years. The state notes that Peters complains that he received the maximum sentence and argues that the evidence amply supported the greater charge of second degree murder, but the trial court supported its sentence by considering that the evidence presented proved the greater crime of second degree murder and by considering that the victim was a paraplegic in a wheelchair and was shot fourteen times.
If the jury had convicted Peters of second degree murder, his sentence would have been life imprisonment at hard labor without benefit of parole, probation, or [ ^suspension of sentence. La. R.S. 14:30.1 B. The jury convicted Peters of manslaughter, and the maximum sentence was forty years at hard labor.[4]
In State v. Veal, 12-0712 (La.App. 4 Cir. 5/1/13), 116 So.3d 779, quoting State v. Smith, 01-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, this court set out the pertinent law relating to the review of excessive sentences:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ••• excessive ••• 'punishment.” (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906....
This Court in Batiste, [5] at p. 18, 947 So.2d at 820 further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in *319 La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra [871 So.2d 1235 (La.App. 4 Cir.2004) ]; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 8/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Landos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Landry, 2003-1671 at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
Veal, p. 13, 116 So.3d at 792-94.
In State v. Colbert, 07-0947 (La.App. 4 Cir. 7/23/08), 990 So.2d 76, the defendant had been charged with second degree murder, found guilty of manslaughter, and sentenced to serve forty years at hard labor, the statutory maximum.[6] This court found that the trial court had complied with the guidelines of La.C.Cr.P. art. 894. The trial court had reviewed the pre-sentence investigation report and the defendant’s extensive criminal history. The trial court noted that the victim was an innocent bystander who had become friends with the mother of the ^defendant's baby. The victim was not armed and in no way provoked the defendant. We said:
Likewise, although the appellant here was convicted of manslaughter, the State originally charged him with second degree murder. Indeed, the fact that the appellant was lying in wait with a gun when Ms. Alexander [his baby’s mother] and Jefferson [her friend] arrived on the scene shows that his actions were not exactly spontaneous reactions to seeing Ms. Alexander and Jefferson together. In addition, this court has upheld forty-year sentences for manslaughter in the past. See State v. Allen, 2006-1434 (La.App. 4 Cir. 3/7/07), 954 So.2d 779 (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); State v. Bell, 2002-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder); State v. Jones, 2001-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought). Given the circumstances of this case, we cannot say that *320 the trial court abused its discretion by-imposing the maximum sentence for manslaughter.
[Footnote omitted.] Colbert, p. 29, 990 So.2d at 93-94.
In this case Peters was convicted of being one of the men involved in a drive-by shooting. Three shooters fired repeatedly with semi-automatic weapons at Sedale Dorsey, a paraplegic in a wheelchair. The victim was shot fourteen times. At sentencing the trial court stated that Peters had been charged with second degree murder, but was convicted of manslaughter. The trial court stated:
Mr. Peters, you went to trial in this Court for Second Degree Murder. You did not testify. The victim in this ease was a paraplegic seated in a wheelchair that was shot 14 times, as the evidence said. I think that the jury | ^finding you guilty of a lessor [sic] charge of Manslaughter was the mercy that they gave you.
The trial court set out its reasons for imposing the maximum sentence for manslaughter, which included that the state had proven second degree murder, which carries a life sentence without benefits. The court articulated its reasons for the sentence. The trial court did not abuse its sentencing discretion in this case.
' This assignment of error lacks merit. CONCLUSION
We affirm Joseph Peters’ conviction and sentence.
AFFIRMED.
LANDRIEU, J., Concurs in the Result.

. On 23 January 2013, the state amended the charge to manslaughter, and Allen pleaded guilty. He waived delays, and the trial court sentenced him to fifteen years at hard labor, to run concurrently with any and all sentences. The state also entered a nolle prose-qui of Tolbert's second degree murder charge.

. In this case, the specimens were sent to the Louisiana State Police for analysis.

. During argument relating to state motions in limine without the jurors present, the state noted that the dashboard cam on the NOPD unit videotaped the chase, the crash, and the three suspects’ exit. The state said: "We have him hopping out of the car after dropping the gun that was used in the shooting.”

. The state filed a motion seeking imposition of the firearm sentencing provisions under La.C.Cr.P. art. 893.3 E, and the mandatory minimum then would have been twenty years, and the maximum would have been forty years without benefit of parole, probation, or suspension of sentence. Appellate counsel states that the trial court did not mention whether or not it was considering the article. The trial court did not mention the article and did not restrict the forty-year sentence. In Alleyne v. United States, — U.S. -, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013), the Supreme Court held that any fact that increases the mandatory minimum is an "element” that must be submitted to the jury; we note nothing in the record on appeal indicates that the jury made such a finding.

. State v. Batiste, 06-0875 (La.12/20/06), 947 So.2d 810, 820.

. Colbert also had a second conviction for attempted second degree kidnapping in the case; he additionally received the maximum sentence as to that charge.