JUDGE SANDRA CABRINA JENKINS
Defendant, Rayne Williams, was charged by bill of information on May 17, 2012, with one count of attempted second degree murder, a violation of La. R.S. 14:(27)30.1. His co-defendant, Greenville Mahogany, was also charged in the same *339 bill of information with one count of attempted second degree murder and one count of discharging a firearm during a crime of violence, in violation of La. R.S. 14:98(F).[1] On February 21, 2014, at the conclusion of a joint bench trial, the trial court found each defendant guilty as charged. The trial court sentenced defendant to ten years at hard labor without benefit of parole, probation, or suspension of sentence, with credit for time served.
Defendant then filed this appeal of his conviction and sentence, raising two assignments of error. In a prior opinion, State v. Williams , 16-0982 (La. App. 4 Cir. 9/20/17), 225 So.3d 1124 (" Williams I "), this Court concluded that the case should be remanded to the trial court for an evidentiary hearing to determine whether defendant knowingly and intelligently waived his right to a jury trial. In addition, this Court pretermitted and preserved for appellate review defendant's remaining assignment of error as to the sufficiency of the evidence to sustain his conviction.
Defendant sought supervisory review in the Louisiana Supreme Court, arguing that this Court erred in remanding the case without first considering defendant's assignment of error as to the sufficiency of the evidence. The Louisiana Supreme Court granted defendant's writ, reversed this Court's decision, and remanded to this Court for a decision on the pretermitted issue of the sufficiency of the evidence to sustain defendant's conviction, pursuant to State v. Hearold , 603 So.2d 731, 734 (La. 1992). State v.Williams , unpub., 17-1816 (La. 9/21/18), 252 So.3d 892.
Upon review of the evidence and testimony presented to the trial court in this case, viewed in the light most favorable to the prosecution, we find the evidence was sufficient to establish that defendant committed attempted second degree murder. However, as discussed in this Court's prior opinion, we find that the record does not reflect whether defendant knowingly and intelligently waived his right to a jury trial. Williams I , supra Thus, we remand this case to the trial court for an evidentiary hearing to make that determination.
STATEMENT OF FACT[2]
At the bench trial of this case, the following testimony and evidence was presented:
NOPD Officer Zenia Smith Williams responded to the November 20, 2011, shooting of Winfield Brazile on Downman Road. She testified that Christopher Baham was arrested, convicted of the shooting, and received a twenty-year sentence.
Winfield Brazile, III, the victim, testified that he was a lifelong resident of New Orleans and the CEO of Life or Death Record Company. His job involved staging music concerts, videos, and internet advertisements. One of the venues for his music concerts was the Sports Café ("the club") on Downman Road. The victim recalled an incident that occurred at the club on October 9, 2011, at about midnight. The victim saw his "godbrother" and Baham involved in a verbal altercation. The victim's "godbrother" told the victim that he did not know Baham and then walked away. Baham then told the victim, "It's going down," as soon as the victim left the premises. The club's D.J. informed the victim that Baham was his cousin, and he would *340 handle the matter with Baham outside. As Baham left the club with the D.J., he told the victim he was armed. The victim told the group still inside the club he did not want any trouble. Shortly thereafter, Baham and one of his friends re-entered the club, stood next to the victim, and began sizing him up. Once again, the victim told Baham that he did not want any trouble. Fearing Baham would attack him, the victim struck Baham in the face while exiting the club and ran. The victim encountered the police in the parking lot and explained he was threatened by someone inside the club, after which the police advised the victim to leave the area.
On the night of November 20, 2011, the victim had another concert at the Sports Café. At about 2:30 a.m., the victim noticed Greenville Mahogany enter the club with a friend. Recognizing Mahogany from the previous incident at the club, the victim was uncomfortable in Mahogany's presence and decided to leave. When the victim went out to his car, Mahogany was leaning on the vehicle in front of the victim's car. The victim then looked over his shoulder and observed Baham running at him holding a gun. The victim recognized Baham as the man he had hit in the face during the previous incident at the club. When he saw Baham approaching with the gun, the victim turned and ran to a service station on Dwyer and Downman Road. As he fled, the victim heard gun shots and felt the impact of being hit in his side and his back.
The victim spent four days in a hospital recovering from his gunshot wounds. After the victim was released from the hospital, he did some "Facebook research" to learn the identity of the people involved in the incidents at the club. He relayed to the police the information and pictures he gathered online.
On December 19, 2011, as the victim stopped to speak with a friend at a mechanic shop on the I-10 Service Road and Morrison Avenue, he noticed a white Dodge Charger enter the parking lot and drive past him. The victim noticed that the defendant was driving the Charger.[3] The victim told his friend that he had to leave because he believed that the men in the Charger had something to do with him being shot in the earlier incident. As the victim drove from the parking lot, he observed the Charger follow his car. The victim drove on the I-10 Service Road and turned onto Mayo Boulevard with the Charger following him. At the next intersection, the victim's passage was blocked by a truck. At that point, the Charger pulled alongside the victim's car. The victim saw Mahogany, riding as a passenger in the Charger, lean out of the window, pull a gun, and start shooting at the victim. Mahogany fired several shots into the victim's car; then, the Charger drove off. The victim was able to drive to his girlfriend's house, where he discovered he had been shot in his left side. His girlfriend called an ambulance, and the victim was transported to the hospital.
After he was released from the hospital, the victim contacted Detective Guient, telling him that he believed Mahogany and a man named "Junior" or "Ace" were responsible for this second shooting. The victim supplied Det. Guient with a picture of Mahogany, who the victim stated was the man who shot him, retrieved from Facebook.[4] Later, defendant learned that *341 the name of the second person involved in the shooting was not "Junior" but Rayne Williams, defendant. The victim spoke again with Det. Guient about how he learned the name of defendant from pictures found on Facebook.[5] Then, fearing for his safety, the victim left New Orleans and did not return until after Mahogany was arrested.
On January 24, 2012, the victim returned to New Orleans and spoke with Det. Guient, who had compiled photographic lineups. From two six-pack photographic lineups, the victim identified Mahogany, as the person who shot him, and defendant, as the person driving the Charger.
David Murthil testified that he had known the victim since childhood, and he knew Mahogany because they had been cellmates at Orleans Parish Prison from 2011 to 2012; however, Murthil did not know defendant. Murthil stated that he learned about the December 2011 shooting from Mahogany while they were cellmates. Mahogany had asked Murthil if he was from New Orleans East and if he knew someone named "Spooney."[6] When Murthil denied knowing that person, Mahogany told Murthil about an incident at the Sports Café involving "Spooney." Mahogany stated that this "Spooney" had hit his friend, Christopher Baham, with a beer bottle; and on the next night, when Mahogany and Baham spotted "Spooney" drive up to the Sports Café, Mahogany distracted "Spooney" and Baham shot him. Mahogany also told Murthil that he later learned that "Spooney" was still alive and "had some money out on his head"; so Mahogany and defendant found and shot the victim on Morrison Avenue and Mayo Street.
Murthil testified that he relayed to the victim, whom he knew as "Scoonie," what Mahogany had told him. Subsequently, Mahogany learned that Murthil knew the victim as "Scoonie" not "Spooney." When Mahogany found out about Murthil's relationship with the victim, he backtracked from his confession and stated that he only told Murthil what the State was alleging he had done to the victim.
Murthil also testified that he was incarcerated at the time of this trial, serving a sentence on a burglary conviction; but he stated that the State had not promised him anything in return for his testimony.
During cross-examination, Murthil stated that Mahogany also told him the victim shot back at him and the defendant. Murthil later added that "Scoonie" told him he tried to defend himself and shoot back when "Rayne and Greenie [Mahogany] pulled up on him and started shooting."
NOPD Detective Borjius Guient testified that he was the lead investigator to the shooting that injured the victim on December 19, 2011. Det. Guient stated that the victim's injury did not require any surgical repair and that the victim was coherent when Det. Guient conducted an initial interview with him at the hospital. During that initial interview, the victim could not identify the person driving the vehicle involved in the shooting. Det. Guient also testified that the vehicle involved in the shooting was recovered, but he stated there was no physical evidence linking defendant to that vehicle.
On January 24, 2012, Det. Guient spoke with the victim by phone. At that time, the victim told him that the second person in *342 the vehicle went by the name "Junior." After they spoke, Det. Guient arranged for the victim to view photographic lineups. From one of the lineups, the victim identified defendant as the second person involved in the shooting. However, shortly afterwards, the victim contacted Det. Guient and stated he wanted to be "a hundred percent sure" and he would contact Det. Guient when he was sure about his identification. Subsequently, in April 2012, the victim made a second photographic lineup identification of defendant as the person driving the vehicle involved in his shooting. Based on that identification, Det. Guient obtained an arrest warrant for defendant.
NOPD Officer Donald Blackwell testified that he was the initial officer to investigate the shooting on December 19, 2011. Blackwell spoke to the victim at the hospital. The victim, who was conscious and lucid, related to Blackwell that he was speaking to a friend, when a white Dodge Charger pulled up. The friend asked the victim whether the person in the Charger was "Greenie," the man who had shot him. The victim told Ofc. Blackwell that as he drove away, he was followed by the Charger, which was driven by "Junior" or "Ace," with "Greenie" riding as a passenger. At some point, the Charger pulled alongside the victim's car, and the occupant fired at the victim. Ofc. Blackwell acknowledged that the victim did not mention the name of Mahogany or defendant during the interview.
The victim was recalled to testify by defense counsel. Defense counsel asked the victim about his relationship to Murthil. The victim referred to Murthil as a close friend and confirmed that he and Murthil had several conversations, while Murthil and Mahogany were cellmates, about Mahogany having shot the victim. The victim vehemently denied telling his friend "Aaron" that Mahogany did not shoot him; however, he admitted to defense counsel that he thought of dealing with Mahogany via "street justice." The victim testified he had owned guns in the past but not at the time of this shooting. He acknowledged that he obtained a picture of Mahogany from a local webpage and gave that picture to the police as identification of the man who shot him.
Ms. Gaidrelle Chamberlain testified that Mahogany was her best friend. Ms. Chamberlain stated that on December 19, 2011, the day of this shooting, Mahogany was helping her cut the grass at her mother's house on West Laverne Street at around noon. She stated that they finished cutting the grass about an hour later and remained together until 2:00 a.m. or 3:00 a.m. the following morning. Ms. Chamberlain asserted that Mahogany did not leave her company the entire day.
Mahogany testified in his own defense. He corroborated Ms. Chamberlain's testimony regarding his whereabouts on December 19, 2011. He denied shooting the victim and stated he did not know the victim or have any disputes with him or the victim's friends. Mahogany stated he witnessed the victim hit Baham with a beer bottle at the Sports Café on Downman Road. However, he denied knowing what the problem was between the victim and Baham, and he did not interject himself into their dispute. Mahogany also denied telling Murthil he attempted to kill the victim.
Defendant did not testify during the trial.
DISCUSSION
Sufficiency of the Evidence
In the second assignment of error, previously pretermitted by this Court, defendant argues that the evidence is insufficient *343 to prove that he was a principal to the attempted murder of the victim.
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Ennis , 11-0976, pp. 4-5 (La. App. 4 Cir. 7/5/12), 97 So.3d 575, 579 (quoting State v. Brown , 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18 ).
"When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' " Brown , 03-0897, p. 22, 907 So.2d at 18 (citing State v. Neal , 00-0674, p. 9, 796 So.2d 649, 657 (La. 2001) ). Ultimately, all evidence, both direct and circumstantial must be meet the Jackson reasonable doubt standard. Id. (citing State v. Rosiere , 488 So.2d 965, 968 (La. 1986) ).
"When a key issue at trial whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt." State v. Peters , 12-1641, p. 17 (La. App. 4 Cir. 8/21/13), 123 So.3d 307, 316 (quoting State v. Holmes , 05-1248, pp. 8-9 (La. App. 4 Cir. 5/10/06), 931 So.2d 1157, 1162 ). "The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses." Id. , 12-1641, pp. 17-18, 123 So.3d at 317. "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." State v. Taylor , 12-0345, p. 19 (La. App. 4 Cir. 6/26/13), 118 So.3d 65, 77. The trier of fact's determination of the credibility of a witness is entitled to great deference and will not be disturbed unless it is clearly contrary to the evidence. State v. James , 09-1188, p. 4 (La. App. 4 Cir. 2/24/10), 32 So.3d 993, 996 (citing State v. Vessell , 450 So.2d 938, 943 (La. 1984) ).
In this case, defendant was convicted of attempted second degree murder. To obtain a conviction for attempted second degree murder, the State must prove the defendant: (1) intended to kill the victim; and (2) committed an overt act tending towards the accomplishment of the victim's death. Id. (citing Bishop , 01-2548, p. 4, 835 So.2d at 437 ). Attempted second degree murder requires proof of specific intent to kill. State v. Bishop , 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437. Specific intent exists "when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the defendant's actions. State v. Johnson , 08-1488, p. 9 (La. App. 4 Cir. 2/10/10), 33 So.3d 328, 334.
In addition, La. R.S. 14:24 provides that, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." In order to convict a defendant as a principal to an offense, the State must show that a defendant has the requisite mental intent to commit the offense.
*344 State v. Pleasant , 11-1675, p. 18 (La. App. 4 Cir. 10/17/12), 102 So.3d 247, 257. "Although factors that can contribute to the finding that a defendant is a principal include 'standing by the scene of the crime ready to give some aid if needed, it is necessary that the principal actually be aware of the accomplice's intention.' " Id. (quoting State v. Anderson , 97-1301, p. 3 (La. 2/6/98), 707 So.2d 1223, 1225 ).
Defendant argues that the victim did not originally identify defendant as the driver of the Charger and gave conflicting statements about whether defendant or Mahogany was driving the Charger; thus, he argues that the victim's identification is unreliable. In addition, defendant argues there is no direct, physical evidence implicating defendant in the shooting; and, consequently, he asserts that the State failed to carry its burden to prove defendant's identity as a principal to the offense.
At trial, the victim testified that he saw defendant driving the white Charger that pulled into the parking lot where he was talking with a friend; he observed the Charger following him as he drove to his girlfriend's house; then, when the Charger pulled up alongside him, the victim saw defendant driving and Mahogany lean out the passenger window, pull a gun, and start shooting at him. Although the victim acknowledged that he incorrectly stated to Det. Guient that the driver went by the name "Junior" or "Ace," the victim recognized defendant in the pictures he found on Facebook as the person driving the Charger when he was shot by Mahogany. The victim later identified defendant in two separate photographic lineups, to which Det. Guient testified. In addition, Murthil testified that Mahogany told him that he and Rayne found the victim, followed him, and shot him.
Viewing all of the testimony and evidence presented at trial in the light most favorable to the prosecution, we find sufficient evidence establishing that defendant was the driver of the Charger that pursued the victim and that defendant pulled the Charger alongside the victim's car to allow Mahogany to shoot the victim. Although there was no direct, physical evidence connecting defendant to the shooting, the trial court's determination of the credibility of the State's witnesses is entitled to great weight; and we find nothing in this record to indicate that the trial court abused its discretion in crediting the testimony of those witnesses to find defendant guilty of the charged offense. See Pleasant , 11-1675, pp. 22-23, 102 So.3d at 259. Thus, we find sufficient evidence to support the trial court's verdict finding defendant guilty of the attempted second murder of the victim.
This assignment of error has no merit.
Jury Trial Waiver
In our prior opinion, Williams I , we found merit in defendant's first assignment of error that the record of this case does not indicate that defendant knowingly and intelligently waived his right to a jury trial. 16-0982, pp. 2-5, 225 So.3d at 1126-27. As previously discussed, the waiver of the right to a jury trial cannot be presumed; a waiver of the right to trial by jury is valid only if the defendant acted knowingly and voluntarily. State v. McCarroll , 337 So.2d 475, 480 (La. 1976) ; State v. Santee , 02-0693, p. 3 (La. App. 4 Cir. 12/4/02), 834 So.2d 533, 534 ; State v. Kahey , 436 So.2d 475 (La. 1983). In our de novo review, we found no written waiver of a jury trial, nor a colloquy between the trial court and defendant indicating that defendant made a knowing, intelligent waiver of his right to a jury trial. We need not revisit this assignment of error, as the record has not changed. "Where no evidence in the record exists showing a defendant specifically waived the right to a jury trial, the case must be remanded for an evidentiary hearing to *345 determine whether the defendant knowingly waived his right." State v. Fortenberry , 11-0022, p. 5 (La. App. 4 Cir. 7/27/11), 73 So.3d 391, 394 (collecting cases). Accordingly, we remand this matter to the trial court for an evidentiary hearing to determine whether defendant knowingly and intelligently waived his right to a jury trial.
CONCLUSION
Upon review of the evidence and testimony presented at trial, we find sufficient evidence to sustain defendant's conviction for attempted second degree murder. However, the record fails to show that defendant knowingly and intelligently waived his right to a jury trial. Accordingly, we conditionally affirm defendant's conviction and sentence; and, in accordance with State v. Nanlal , 97-0786 (La. 9/26/97), 701 So.2d 963, we remand for an evidentiary hearing to determine whether defendant knowingly and intelligently waived his right to a jury trial. If the trial court determines that defendant did not knowingly and intelligently waive his right to a jury trial, then defendant shall be granted a new trial. Id. ; Fortenberry , 11-0022, p. 11, 73 So.3d at 398.
CONDITIONALLY AFFIRMED; REMANDED WITH INSTRUCTIONS

In this Court's prior opinion, we incorrectly stated that defendant, rather than Mahogany, was also charged with one count of discharging a firearm during a crime of violence. Williams I , 16-0982, p. 2, 225 So.3d at 1126.

The procedural background of this case was discussed in this Court's prior opinion. Williams I , 16-0982, p. 2, 225 So.3d at 1126.

The victim had not seen defendant during the previous incidents. He made an in-court identification of defendant as the person he saw on December 19, 2011, driving the Charger.

The victim identified the picture of Mahogany that he supplied to Det. Guient.

The victim identified a second picture from Facebook in which he recognized defendant and which he provided to Det. Guient.

The victim testified that he was known by the nickname "Scoonie."